# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Battersea Ventures, L.P.,         :
                 Appellant    :
                                  :
           v.                 :    No. 1440 C.D. 2019
                                  :    Argued:  October 13, 2020
Philadelphia Zoning Board of     :
Adjustment and The City of       :
Philadelphia, UCFP LLC          :


BEFORE:    **HONORABLE RENÉE COHN JUBELIRER,** Judge
                 **HONORABLE ELLEN CEISLER,** Judge
                 **HONORABLE J. ANDREW CROMPTON,** Judge


**OPINION NOT REPORTED**


**MEMORANDUM OPINION BY**
**JUDGE COHN JUBELIRER**             **FILED:  November 18, 2020**


Battersea Ventures, L.P. (Objector) appeals from an Order of the Court of Common Pleas of Philadelphia County (common pleas) dated August 14, 2019, which affirmed the Decision of the Philadelphia (City) Zoning Board of Adjustment (Board) denying Objector's appeal from the issuance of a zoning/use permit (Permit) by the Philadelphia Department of Licenses and Inspections (Department) to UCFP LLC (Developer).[1]  The Permit granted Developer permission to erect a 10-story, multi-family condominium building with a parking garage located below the finished floors (Proposed Development) on the property situated at 2100 Hamilton Street (Property).  The Board denied Objector's appeal from the issuance of the Permit, determining Objector lacked standing to appeal and that the proposed

---

[1] The Board and the City are not participating in this appeal.

development was consistent with the applicable requirements set forth in The Philadelphia Code.[2]  Objector is the owner of Dalian on the Park (Dalian), a 300-unit residential development located across the street from the Property.  On appeal to this Court, Objector argues that it has standing to challenge the issuance of the Permit and that the Board erred in concluding the Proposed Development is consistent with the Code.  Upon review, for the reasons that follow, we affirm.[3]

---

[2] In their briefs, both Objector and Developer cite sections of the Code not included in the record.  Pursuant to Section 6107(a) of the Judicial Code, "[t]he ordinances of municipal corporations of this Commonwealth shall be judicially noticed."  42 Pa.C.S. § 6107(a).  Therefore, the Court takes judicial notice of the Code.  Department's website, https://www.phila.gov/departments/department-of-licenses-and-inspections/resources/applicable-codes/, contains a link to the Code, available at https://codelibrary.amlegal.com/codes/philadelphia/latest/philadelphia_pa/0-0-0-203439#JD_Title14 (last visited Nov. 17, 2020).

[3] Also pending in this matter is an Application in the Nature of a Motion to Dismiss for Mootness (Application) filed by Developer, wherein Developer avers this appeal is moot because, while this case was pending before common pleas, Developer obtained another zoning/use permit revising the Permit at issue in this appeal.  Objector filed an Answer denying the legal conclusions in the Application.  Shortly before argument in this case, Developer, Objector, and the Board filed a stipulation with this Court, wherein Developer agreed, among other things, to withdraw its Application.  (Stip. ¶ 2.)  Accordingly, we will mark the Application withdrawn.  However, the question of mootness is jurisdictional in nature, which a court can raise sua sponte.  *Harris v. Rendell*, 982 A.2d 1030, 1035 (Pa. Cmwlth. 2009).  In its application for the subsequent zoning/use permit, Developer stated it was submitting "revised plans for [the] project previously approved . . . without prejudice to, or abandonment of, all prior permits and approvals at the property."  (Answer, Ex. A.)  In reserving these rights, Developer essentially preserved its ability to reuse the Permit at issue in this case, thereby making that Permit's continued viability not moot.  Because the subsequent zoning/use permit is tied to the Permit at issue here and because Developer specifically stated it was not abandoning that Permit, we conclude that this appeal is not moot and proceed to the merits.

## I. FACTUAL BACKGROUND AND PROCEDURE

### A. The Property

The Property is situated at the corner of Hamilton and 21st Street and is located in an RM-4 zoning district,[4] which allows for residential multi-family use, and within the Benjamin Franklin Parkway Overlay. Developer acquired the Property from Pennsylvania Avenue Land Development Limited Partnership, L.P. (PLDLP), through a Quitclaim Deed in Lieu of Foreclosure dated January 15, 2011. (Decision, Finding of Fact (FOF) ¶ 9; Reproduced Record (R.R.) at 259a-67a.) The Property, in its entirety, is situated within an open-air railroad cut that is "approximately 30[-]feet below street level." (FOF ¶ 8.) The Property "consists of three parcels," two of which Developer owns in fee and the third being an air rights parcel. (*Id.* ¶ 10; R.R. at 259a-67a.) With respect to the air rights parcel, Developer's ownership interests include the "air rights space being located [22] feet 6 inches (22'6) above the top of the existing railroad tract" and "an easement to locate and erect . . . walls, piers, columns, supports, footings[,] and foundations" below the air rights parcel. (FOF ¶ 11; R.R. at 261a-62a.)

On December 21, 2000, prior to Developer's acquisition of the Property, Department issued a zoning/use permit to PLDLP (2000 Permit) to "relocate lot lines to create 1 lot from 3 lots" and to "[e]rect a 10[-s]tory [c]ondominium." (FOF ¶ 12; R.R. at 520a.) Department issued a second identical permit to PLDLP on December 27, 2001 (2001 Permit). (FOF ¶ 12; R.R. at 524a.) PLDLP began construction on the Property, including erecting columns and foundations, but did not complete development. (FOF ¶¶ 51-52, 66.)

---

[4] The Board appears to have mistakenly identified the Property as being located in an R-3 zoning district in Finding of Fact 8. However, elsewhere in its findings, the Board cites to testimony that correctly identified the Property as being located in an RM-4 zoning district.

## B. The Proposed Development

After acquiring the Property, Developer, like its predecessor, proposed to construct a 10-story condominium building on the site. On March 31, 2018, Department issued the Permit to Developer permitting it to build a 125-foot, 10-story, 33-unit, multi-family condominium building with "underground parking" consisting of 48 parking spaces, including 2 handicap spaces, 1 of which is a van accessible space, 4 electric car spaces, and 11 bicycle spaces. (*Id.* ¶ 1; R.R. at 257a.) Objector appealed the issuance of the Permit to the Board.

## C. Appeal to the Board

The Board considered Objector's appeal at public hearings held on August 21, 2018, and September 25, 2018. Before the Board, Objector argued, in relevant part:

a. That the Property remained three separate legal parcels and [Department] therefore erred in treating it as a single zoning lot;

b. That the area of the air rights parcel should not have been included in calculating the square footage of the Property;

c. That [Department] erred in measuring proposed height from street level rather than the bed of the railroad cut[; and]

d. That [Department] erred in treating the proposed parking levels as an "underground garage" and excluding them from the gross floor area calculation[.]

(FOF ¶ 13.) In support of these arguments, Objector presented the testimony of a Former Commissioner of Department, Bennett Levin.[5] He stated that the 2000 and 2001 Permits issued to PLDLP, which authorized consolidation of the three parcels

---

[5] The testimony of the Former Commissioner can be found on pages 78a-95a and 225a-28a of the Reproduced Record.

and the erection of a 10-story condominium building, lapsed because construction was not completed. (FOF ¶ 18(b).) Further, the Former Commissioner opined that since no deed of consolidation was filed by PLDLP to vest the consolidation portion of the permits, that portion also expired. (*Id.*) When asked by the City's attorney what section of the Code in effect in 2000 and 2001 required a deed of consolidation to be filed to vest a permit for consolidation, the Former Commissioner could not identify a particular section but stated the requirement that a deed of consolidation be filed "existed in 1995 when [he] was commissioner. Whether it was in the [C]ode or by regulation that was the practice back then." (R.R. at 91a-92a; *see also* FOF ¶ 27.)

With respect to the lot area of the Property, the Former Commissioner stated that the air rights parcel should not have been included in the measurement of the lot area because the air rights parcel is not at ground level, which he believed was the bottom of the railroad cut. By including the air rights parcel in the measurement of the lot area, the Former Commissioner opined, the allowable gross floor area for the proposed development was overestimated. (FOF ¶ 18(c), (e).) Based upon his belief that the ground level of the Property was the bottom of the railroad cut, rather than the area at street level, the Former Commissioner concluded that the proposed parking garage is, in fact, aboveground and should have been included in the gross floor area calculation. For the ground level of the Property to be the equivalent of street level, the Former Commissioner stated, the railroad cut would have "to be filled." (*Id.* ¶ 18(c).) The Former Commissioner testified that if Developer's plan had come before him when he was a commissioner, he "would have revoked the [P]ermit." (*Id.* ¶ 19.)

5

Objector also presented the testimony of the Director of Development for the Dalian, Marston Smith.[6] When asked "[w]hat objection does [the] Dalian . . . have with the project," the Director of Development stated that Objector was excluded from the review process, that "[t]here was no civil design review [b]oard processing," and that the proposed development "will cast a shadow [] and [] will interfere with [the] views from our property." (R.R. at 210a-11a; *see also* FOF ¶¶ 89-90.) When asked by Developer's attorney, "[is] your only objection that the [P]ermit does not comply with the [] Code's requirements," the Director of Development responded "[y]es." (FOF ¶ 93.)

The City presented the testimony of the Zoning Examiner, Cheli Dahal, who reviewed Developer's zoning application.[7] Relying upon the site plans submitted by Developer, she measured ground level from street level and calculated the allowable gross floor area using the lot area reflected on the site plan. (*Id.* ¶ 32.) As to consolidation, the Zoning Examiner testified that she reviewed the history of the Property, including the 2000 and 2001 Permits, and concluded that the Property consisted of a single consolidated lot. (*Id.* ¶ 31.) After review of the site plans and permit application, the Zoning Examiner determined that the permit should be granted to Developer as-of-right. (*Id.* ¶¶ 33-34.)

The City next presented the testimony of Department's Director of Development Services, Elizabeth Baldwin.[8] She disagreed with the Former Commissioner's testimony that Department's policy during 2000/2001 required a

---

[6] The testimony of the Director of Development for the Dalian can be found on pages 210a-25a of the Reproduced Record.

[7] The testimony of the Zoning Examiner can be found on pages 96a-99a of the Reproduced Record.

[8] The testimony of Department's Director of Development Services can be found on pages 100a-03a of the Reproduced Record.

6

deed of consolidation to consolidate separate parcels. (*Id.* ¶ 38.) She stated that since 2012 the Code has required a deed of consolidation to vest a consolidation permit, but that such deed was not required before 2012. (*Id.*) The Director of Development Services agreed with the Zoning Examiner that the three parcels making up the Property had been consolidated by the 2000 Permit. (*Id.* ¶ 39.) When asked by Developer's attorney whether Department, before 2012, required an application to get temporary account numbers from the Philadelphia Office of Property Assessment (OPA) when seeking to consolidate parcels and that the temporary numbers would only become permanent when a deed was filed with the recorder of deeds, she responded all "[t]hat happened [] outside of zoning" but she "believe[d] that to be the process." (R.R. at 103a.) When asked whether Department would treat the three parcels as a single zoning lot regardless of whether they had been previously consolidated, Department's Director of Development Services replied,

> [t]he zoning record defines the zoning lot. Regardless of ownership, if these are three separate lots reflected in the zoning record, then we consider those three separate lots. However, if there is no zoning record and there are two separate lots that have essentially been used as one zoning lot, then we recognize that.

(FOF ¶ 40.) She also stated that she was not prepared to testify as to whether it was appropriate to consider the proposed parking garage underground. (*Id.* ¶ 43.)

Developer presented the testimony of its Engineer, Tim Boles. The Engineer testified[9] that the site plan, which is based upon a prior survey of the Property,

---

[9] The testimony of Developer's Engineer can be found on pages 111a-25a of the Reproduced Record.

reflects a lot size of 27,050 square feet at street level and is consistent with the 2001 Permit. (*Id.* ¶¶ 47-48.)

Developer next presented the testimony of its Architect, Chris Blakelock.[10] He stated that in creating the plans for the project his intentions were "to establish the limits of our [floor area ratio] and our height and design a building to fit within those." (*Id.* ¶ 54.) He explained that the allowable gross floor area is calculated by multiplying the lot area, which is taken from the survey, by three and a half, the floor area ratio in the RM-4 zoning district. (*Id.* ¶¶ 55-56.) He stated that "[p]arking does not count" against the allowable gross floor area and, therefore, the parking garage in this case was not counted against the allowable gross floor area. (*Id.* ¶ 57.)

As to height, he testified that the permitted height in the Benjamin Franklin Parkway Overlay is 125 feet and that height is measured

> from the average ground level, which is the way it's done using the [] [C]ode definition, and in our case, we had to take the ground level, the finished grade level at the principal corners of the footprint of the building, average them, and that establishes the average ground level.

(*Id.* ¶ 58.) In this case, the Architect explained that the base of the building is at street level, that there are foundations between the street level and the bottom of the railroad cut, and that height is not measured from where the foundations begin because that is not the base of the building. (*Id.* ¶ 74.)

Lastly, Developer presented the testimony of a Licensed Engineer, Michael Tantala, as an expert witness.[11] The Licensed Engineer testified that in 2001 a permit for a lot line relocation or consolidation would not need to be recorded to vest. (*Id.*

---

[10] The testimony of Developer's Architect can be found on pages 126a-72a of the Reproduced Record.

[11] The testimony of the Licensed Engineer can be found on pages 173a-200a of the Reproduced Record.

¶ 79.) He further opined that while building permits expire, "lot consolidations do not." (R.R. at 194a.) Citing a Code Bulletin as support, he testified that deed descriptions or tax groupings do not supersede zoning records and, therefore, to the extent the prior deeds or OPA treats the three parcels as unconsolidated, those are not controlling. (FOF ¶ 85.)

After the hearings, Objector and Developer submitted briefs to the Board. After review of the briefs, the Board voted to deny Objector's appeal on October 10, 2018. (*Id.* ¶ 99.) The Board issued findings of fact and conclusions of law on April 8, 2019. In addition to the relevant Findings of Fact cited above, the Board made the following pertinent conclusions of law:

> 6. In issuing the challenged permit, [Department] determined the [P]roposed [D]evelopment met all applicable requirements of the [] Code. The evidence of record and the relevant Code language support this conclusion.
>
> 7. With regard to the lot consolidation, the Board found the testimony of the City's witnesses and the expert witnesses called by the permit holder both credible and persuasive. While a consolidation requested today would require the filing of a deed of consolidation in order to be perfected, there was no such requirement when the 2001 and 2000 [P]ermits were issued. The prior owner obtained a by-right permit for the consolidation and undertook work on the [P]roposed [Development's] foundation after obtaining the permit. [Department], the agency charged with administering the [] Code, found this sufficient to vest the permit insofar as the lot consolidation was concerned. The Board agrees and accordingly finds that the parcels are consolidated under the 2000 and 2001 [P]ermits (with the 2001 approval being, at most, an unnecessary duplication of the earlier consolidation) and that the approval did not lapse.
>
> 8. The Code language relating to lapse of permits in effect when the 2000 and 2001 [P]ermits were issued provided:

Zoning and/or Use Registration Permits . . . with respect to construction and use of a property, or where interior alterations are involved, shall expire one year after the date of issuance unless construction is begun prior thereto and is carried on t[o] completion without voluntary interruption.

[*Former* Section 14-703(4) of the Code, *f]ormer* Phila. Code § 14-1703(4).

9. The Board concludes that this Code provision did not result in lapse of the [P]ermits insofar as [it] approved a lot consolidation because the approval did not involve "construction and use of a property."

10. The Board further concludes that the Property would properly be considered a single zoning lot even absent the prior [P]ermits consolidating the three parcels. [Department's Director of Development Services'] testimony and the Code Bulletin cited by [the] expert witness . . . confirm[s] that the determination of what constitutes a "zoning lot" is made with reference to the property's zoning history; deed descriptions and tax parcel identifications are not determinative. In her testimony, [Department's Director of Development Services] distinguished between consolidation of parcels previously recognized as separate zoning lots and parcels that had been used as a single lot but for which no zoning record existed. With regard to the latter, she said that three separately deeded parcels would be recognized as a single zoning lot if "there were no zoning records that indicated something different." . . . .

11. Here, there is no inconsistent zoning history showing the subject parcels to have previously been recognized as individual zoning lots by [Department]. The parcels are held in common ownership, were transferred under a single deed, and have on three separate occasions involving two different owners been approved for development as a single, unified property. Under [Department's] interpretation, they therefore constitute a single zoning lot.

12. With regard to [Department's] inclusion of the air rights parcel for purposes of determining lot size and permitted square footage, the Board finds [Department's] interpretation of the relevant Code requirements reasonable and consistent with the statutory language.

. . . .

10

14.   The Code defines "lot" as "a parcel of land consisting of a horizontal plane bounded by vertical planes that comprise its front, side, and rear lot lines, and that is intended or designed to be used, developed, or built upon as a unit."   The Board concludes that the three consolidated parcels meet this definition and that the air rights parcel was therefore properly included in the lot size calculation.

15.   With regard to what constitutes ground level for purposes of measuring height and determining whether proposed parking is "underground," the Board concludes that [Department] properly measured ground level from street level, rather than from the base of the railroad cut.   Both the applicable Code language and, as [Developer's] witness [the Architect] noted, "common sense[]" support this interpretation.

16.   The Department, having measured ground level at street level, correctly determined that the proposed height was permitted and that the proposed parking levels did not count toward gross floor area for purposes of determining [floor area ratio].

. . . .

18.   The Board finally concludes that [Objector] did not establish standing to challenge the subject [P]ermit.

. . . .

21.   At the September 25, 2018, zoning hearing, [the Dalian's Director of Development Services] complained that the permit was issued without community involvement and said the [P]roposed [Development] "will cast a shadow, and it will interfere with views from our property."

22.   Because the challenged permit was issued by right, community involvement and input were not required.   As for the claimed detrimental impact on light and views, [Objector] did not present expert testimony or other evidence supporting these claims.   The Board concludes that [the Dalian's Director of Development Services'] vague, unsubstantiated claims regarding injury to [Objector's] property did not meet the standards for establishing standing stated by the [Supreme Court in] *Spahn* [*v. Zoning Board of Adjustment*, 977 A.2d 1132 (Pa. 2009).]

11

(Decision, Conclusions of Law (COL) ¶¶ 6-12, 14-16, 18, 21-22.) Thereafter, on November 9, 2018, Objector appealed the Board's Decision to common pleas.

### D. Appeal to Common Pleas

On August 14, 2019, common pleas held oral argument on Objector's appeal. That same day, common pleas entered an Order denying Objector's appeal and affirming the Board's Decision. Thereafter, Objector initiated the instant appeal.[12] After requesting Objector file a Concise Statement of Errors Complained of on Appeal, common pleas issued an Opinion pursuant to Pennsylvania Rule of Appellate Procedure 1925(a), Pa.R.A.P. 1925(a) (1925(a) Opinion), on February 14, 2020. Therein, common pleas agreed with the Board that Objector's "asserted interests are not sufficient to provide it with standing." (1925(a) Opinion (Op.) at 3-4.) Because the Dalian does not adjoin or abut the Property, common pleas concluded that Objector must show a particular harm to have standing to challenge the issuance of the Permit. Noting that before it Objector argued the Proposed Development would block the view of some of the residents of the Dalian, would cast a shadow over the Dalian, and would reduce public parking, common pleas concluded that Objector "has no affirmative rights to the preservation of its view from its building" and that Objector waived any arguments related to parking because Objector did not raise those issues to the Board. (*Id.* at 5-6.)

---

[12] In this case, "[w]here [common pleas] took no additional evidence, we are limited to determining whether the . . . [B]oard abused its discretion or committed an error of law." *Hafner v. Zoning Hearing Bd. of Allen Twp.*, 974 A.2d 1204, 1209 n.1 (Pa. Cmwlth. 2009). A zoning board abuses its discretion if its "findings are not supported by substantial evidence, that is, such relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Zoning Hearing Bd. of Sadsbury Twp. v. Bd. of Supervisors of Sadsbury Twp.*, 804 A.2d 1274, 1278 (Pa. Cmwlth. 2002).

As to whether ground level was equivalent to street level, common pleas concluded that "[t]he Code is anything but clear when it comes to the definition of [] 'ground . . . .'" (1925(a) Op. at 9.) Upon its examination of the Code and its definitions of "ground floor" and "average ground level," common pleas concluded that the terms "ground" and "ground floor" are "fungible and highly dependent upon the particular circumstances and conditions present at the" property at issue and that since the term "ground" "lack[s] [a] clear definition," it "should be broadly construed" to give Developer the least restrictive use of the Property. (*Id.*)

Having determined that the term "ground" was ambiguous, common pleas determined the Board did not err when it accepted that term to mean "street level" in this particular case. (*Id.* at 10-11.) Based on this determination, common pleas also concluded that the Proposed Development's height was properly measured from street level and did not exceed the maximum height allowed under the Code. Further, common pleas concluded the allowable gross floor area was properly calculated by measuring the lot area at street level and, therefore, the Proposed Development did not exceed the allowable gross floor area ratio provided for in the Code. Lastly, common pleas concluded the Board did not err in concluding the three parcels that make up the Property were consolidated under the 2000 and 2001 Permits because, under the previous version of the Code, a recorded deed of consolidation was not required.

## II. DISCUSSION

Preliminarily, before turning to the parties' arguments, we recount our role in zoning appeals. In reviewing this appeal

> this Court may not substitute its interpretation of the evidence for that
> of the Board, the fact-finder in this case. The Board is the sole judge

13

of the credibility of witnesses and the weight to be afforded their testimony. Thus, it is the Board's function to weigh the evidence before it. If the record contains substantial evidence, this Court is bound by the Board's findings that result from the resolution of credibility and conflicting testimony.

*Oxford Corp. v. Zoning Hearing Bd. of Borough of Oxford*, 34 A.3d 286, 295 n.9 (Pa. Cmwlth. 2011) (citations omitted).

Because the parties' arguments are based on competing interpretations of numerous Code sections, we must engage in statutory construction, which is guided by the following precepts. "[T]he principles of statutory construction apply to the interpretation of zoning ordinances." *Delchester Developers, L.P. v. Zoning Hearing Bd. of Twp. of London Grove,* 161 A.3d 1081, 1103 (Pa. Cmwlth. 2017). The object of interpretation of statutes and ordinances is to ascertain the intent of the drafter. Section 1921(a) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1921(a). In reviewing the Code, "we are mindful that a statute's plain language generally provides the best indication of legislative intent and, thus, statutory construction begins with examination of the text itself." *Kohl v. New Sewickley Twp. Zoning Hearing Bd.*, 108 A.3d 961, 968 (Pa. Cmwlth. 2015). We must construe the words and phrases of the Code "according to the rules of grammar and according to their common and approved usage." Section 1903 of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1903. When reading the plain text of the Code, the rules of construction require that we not read those provisions in isolation, but rather must read those sections in conjunction with all the other sections of the Code. *MERSCORP, Inc. v. Delaware County*, 207 A.3d 855, 865 (Pa. 2019). However, when the language is ambiguous, we must engage in statutory interpretation to ascertain the drafters' intent. *Mohamed v. Dep't of Transp., Bureau of Motor Vehicles*, 40 A.3d 1186, 1194 (Pa. 2012). "A zoning ordinance is ambiguous if the

14

pertinent provision is susceptible to more than one reasonable interpretation . . . or when the language is vague, uncertain, or indefinite." *Kohl*, 108 A.3d at 968 (citations omitted). In such circumstances, the words of a zoning ordinance must be construed "as broadly as possible to give the landowner the benefit of the least restrictive use." *Riverfront Dev. Grp., LLC v. City of Harrisburg Zoning Hearing Bd.*, 109 A.3d 358, 366 (Pa. Cmwlth. 2015). "[T]he rules of statutory construction do not allow for the interpretation of . . . an ordinance which produces an absurd result." *Stoltzfus v. Zoning Hearing Bd. of Eden Twp., Lancaster Cnty.*, 937 A.2d 548, 550 (Pa. Cmwlth. 2007). Further, it is well-settled "that a zoning hearing board's interpretation of its own zoning ordinance is entitled to great weight and deference" because it "possesses knowledge and expertise in interpreting that ordinance." *Risker v. Smith Twp. Zoning Hearing Bd.*, 886 A.2d 727, 731 (Pa. Cmwlth. 2005). Likewise, a zoning officer's interpretation of the ordinance is also entitled to deference unless the zoning officer's interpretation is "shown to be clearly erroneous." *Kohl*, 108 A.3d at 968-69.

With the above principles in mind, we turn to the parties' arguments. Objector argues that the Board erred in concluding that it lacked standing to challenge the Permit. Further, Objector argues the Proposed Development violates the Code in several respects. Objector asserts that the three parcels making up the Property have not been consolidated and, therefore, the Proposed Development violates the Code by straddling property lines. Objector submits that the Board erred by concluding the term "ground level" has the same meaning as "street level." As such, Objector contends that the gross floor area and height of the Proposed Development violate the Code. Developer responds that the Board properly concluded that Objector lacked standing to appeal the issuance of the Permit and there was no error in the

15

Board's interpretations of the Code to conclude that the Proposed Development did not violate the Code.

A. Whether the Board erred in holding that Objector lacked standing to challenge Department's issuance of the Permit.

Objector argues the Board erred by concluding that it lacked standing to challenge the issuance of the Permit because, contrary to the Board's conclusion, Objector will be aggrieved by the Proposed Development. More specifically, Objector, relying on *Plaxton v. Zoning Board of Adjustment*, 213 A.3d 374 (Pa. Cmwlth. 2019), submits that there is a "presumption that a decision related to the Property will have an impact on" the Dalian because of its proximity to the Property. (Objector's Br. at 16.) Further, Objector argues it will be aggrieved by the fact that the Proposed Development "will cast substantial shadows on . . . parts of the Dalian," change the character of the neighborhood, cause congestion, and exacerbate parking shortages. (*Id.* at 16-17.) Citing *Robinson Township v. Commonwealth*, 83 A.3d 901 (Pa. 2013), Objector submits it "and its tenants have a constitutional right to its lawful view of the City's natural historic resources." (Objector's Br. at 18.) Lastly, Objector argues the Proposed Development will violate the Code in several respects and that it "had an investment backed expectation that the Property would be developed in compliance with local zoning regulations." (*Id.* at 17.)

Developer responds that Objector is not aggrieved by the issuance of the Permit and, therefore, lacks standing to challenge its issuance. According to Developer, Objector did not show "that its interest in the Permit was anything more than the interest of all citizens in 'procuring obedience to the law,'" which is insufficient to establish standing. (Developer's Br. at 12-13.) While Objector asserts specific harms in its brief, Developer, citing the testimony of Objector's Director of Development, submits that Objector "later conceded that its only true

concern [] in this matter was limited to whether the Permit complied with the [] Code." (*Id.* at 13.) With respect to Objector's arguments regarding the Proposed Development blocking the Dalian residents' view and casting a shadow, Developer submits Objector "has no right to preservation of the view from its building nor any right not to have a shadow cast on its building, and it cannot be an aggrieved party on these bases." (*Id.* at 13-14.) Developer disagrees that *Plaxton* supports Objector's position because, unlike the objectors therein, Objector did not prove that the Proposed Development will result in concrete harm to Objector. (*Id.* at 15-16.) Since Objector has not demonstrated that it will suffer some concrete harm, Developer maintains the Dalian's "proximity to the [Proposed Development] is irrelevant for purposes of standing." (*Id.* at 16.)

Section 14-303(15)(a.1) of the Code provides that determinations from the Department "may be appealed to the [] Board by any person or organization affected by the decision . . . ." Phila. Code § 14-303(15)(a.1). Likewise, pursuant to Section 14-303(15)(b.1), "[a] final decision made by the [] Board . . . may be appealed to a Pennsylvania Court of Common Pleas by any aggrieved party." Phila. Code § 14-303(15)(b.1). For standing purposes,

> a party is aggrieved if the party can show an interest that is substantial, direct, and immediate. In order to be substantial, there must be some discernible effect on some interest other than the abstract interest all citizens have in the outcome of the proceedings. In order to be direct, the party must show some causation of harm to his interest. In order to be immediate, there must be a causal connection between the action complained of and the injury to the person challenging it.

*Spahn*, 977 A.2d at 1151 (citations omitted).

We have consistently "held that a property owner need not establish pecuniary or financial loss if [the property owner's] property is located in close proximity to

17

the subject property because the zoning decision is presumed to have an effect on the property owner's property." *Laughman v. Zoning Hearing Bd. of Newberry Twp.*, 964 A.2d 19, 22 (Pa. Cmwlth. 2009). A property is proximate to the subject property seeking zoning approval if it is "adjacent to or abuts the [subject] property." *Plaxton*, 213 A.3d at 379 (quoting *Bradley v. Zoning Hearing Bd. of Borough of New Milford*, 63 A.3d 488, 491 (Pa. Cmwlth. 2013)). The Code defines adjacent as "[t]o touch or share a contiguous boundary or border, or to be separated only by an alley, shared driveway, or street." Phila. Code § 14-203(4). This definition is consistent with the common definitions of that term as being defined as "not distant: NEARBY" *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/adjacent (last visited Nov. 17, 2020), or "lying near, close, or contiguous," https://www.dictionary.com/browse/adjacent (last visited Nov. 17, 2020). In *Plaxton*, we held that a property located across the street from the subject property seeking zoning approval is proximate to that subject property. *Id.* at 380. We have also "held that the owner of property that is within 400 to 600 feet of the challenged [property] is within close proximity and has standing" but that "owners of property one-half mile and one mile or more away from the challenged [property]" are not "in close proximity in order to confer standing." *Laughman*, 964 A.2d at 22-23.

Here, the Board found the Dalian is "located directly across Hamilton Street from the Property." (FOF ¶ 2.) Therefore, it is adjacent under the Code and the common understanding of that term, https://www.dictionary.com/browse/adjacent, and is proximate to the Proposed Development, *Plaxton*, 213 A.3d at 390. As such, Objector had standing to challenge the Permit because the permit "is **presumed** to have an effect" on adjacent property. *Laughman*, 964 A.2d at 22 (emphasis added).

18

The fact that the objector in *Plaxton* **also** showed that concrete harm would result from the proposed development in that case does not alter the longstanding presumption that there will be an effect on properties proximate to a proposed development. Thus, regardless of whether Objector demonstrated a specific harm or whether Objector and the Dalian's residents have a legally cognizable right to unobstructed views, Objector had standing to challenge the issuance of the Permit. Accordingly, the Board erred in concluding otherwise.

B. Whether the Board erred when it determined that the Property consisted of a single consolidated lot.

Objector reiterates its position that the Property is made up of three unconsolidated parcels, which it asserts is supported by OPA's treatment of those parcels, the fact that the Deed in Lieu of Foreclosure describes the three parcels separately, and the fact that two of the parcels have different addresses and one does not have an address at all. As the parcels have not been consolidated, Objector asserts the Proposed Development will straddle lot lines in contravention of the Code. Objector disagrees with the Board's conclusions that the 2000 or 2001 Permits consolidated the three parcels and that those permits did not lapse when PLDLP did not commence or complete construction under either of those permits. Relying on the Former Commissioner's testimony, Objector argues that for the lot consolidation provisions in the 2000 or 2001 Permits to vest, PLDLP would have had to obtain a temporary tax parcel from OPA and record a deed of consolidation, which PLDLP did not do. (Objector's Br. at 36.) Objector submits that the testimony of Department's Director of Development Services before the Board in this case and her testimony in another case, *DiCicco v. Philadelphia Zoning Board of Adjustment* (Pa. Cmwlth., No. 2625 C.D. 2015, filed May 10, 2017), corroborates

the Former Commissioner's testimony that such a procedure was required to consolidate parcels in 2000/2001.[13]

Developer responds that the three parcels making up the Property were consolidated by the 2000 and/or 2001 Permits. Citing former Section 14-1703 of the Code, Developer argues "zoning permits for lot consolidation do not expire" as such permits do not pertain to the construction or use of property. (Developer's Br. at 22.) Since zoning permits for lot consolidation do not expire, Developer submits the lot consolidation provisions of the 2000 and 2001 Permits vested automatically. With respect to Objector's argument that a deed of consolidation is required to perfect a permit for lot consolidation, Developer responds that Objector does not rely on any provision of the former zoning code "that stands for that proposition," but relies only on the Former Commissioner's testimony, which is not controlling. (*Id.* at 23.)

In rejecting Objector's argument that the Proposed Development violates the Code by straddling multiple lot lines, the Board specifically found that in 2000 and 2001, the Department issued permits to PLDLP to, among other things, consolidate the three parcels. (FOF ¶ 12; R.R. at 520a, 524a.) The Board acknowledged that "[w]hile a consolidation requested today would require the filing of a deed of consolidation in order to be perfected," it found "there was no such requirement when the 2001 and 2000 [P]ermits were issued" to PLDLP. (COL ¶ 7.) As support, the Board relied on the relevant Code language, which, at the time, provided that "Zoning and/or Use Registration Permits . . . with respect to construction and use of property, or where interior alterations are involved, shall expire one year after the

---

[13] Pursuant to Rule 126(b) of the Pennsylvania Rules of Appellate Procedure, Pa.R.A.P. 126(b), and Section 414(a) of the Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a), unreported panel decisions of this Court may be cited for their persuasive value.

date of issuance unless construction is begun prior thereto and is carried on t[o] completion without voluntary interruption." (*Id.* ¶ 8 (quoting *former* Phila. Code § 14-1703(4)).) The Board determined that "this Code provision did not result in lapse of the permits" issued to PLDLP "insofar as they approved a lot consolidation because that approval did not involve 'construction and use of a property.'" (COL ¶ 9.)

Reviewing that provision's language, the Board's interpretation is reasonable and not contrary to that language and, therefore, is entitled to deference. *Risker*, 886 A.2d at 731. That section clearly stated that a permit "with respect to **construction** and **use** of property . . . shall expire one year after the date of issuance." *Former* Phila. Code § 14-1703(4) (emphasis added). That section, however, was silent with respect to permits authorizing lot consolidation or the relocation of lot lines. We will not read into former Section 14-1703(4) a limitation that was not there and that City Council did not see fit to include. *See Pilchesky v. Lackawanna County*, 88 A.3d 954, 965 (Pa. 2014). In the absence of Code language suggesting otherwise, we cannot conclude the Board erred by determining that the lapse provision of former Section 14-1703(4) applied only to construction and use permits.

Objector relies on the testimony of the Former Commissioner, the OPA's treatment of the three parcels, and the property descriptions contained in the Deed in Lieu of Foreclosure; however, none require a different result. On this point, *DiCicco* is instructive. In *DiCicco*, the landowners filed two applications for zoning/use permits with Department to construct single-family homes on two adjacent, but unconsolidated, parcels that had been described separately in a deed and granted separate tax accounts by OPA. Department issued the requested permits, but subsequently revoked the two permits because its records indicated that

21

the two parcels had, in fact, been consolidated in 1952 when a previous owner of the parcels received permission to consolidate the two parcels in order to construct a home thereon. The Board affirmed, and upon review, we concluded that despite the deed and OPA's treatment of the parcels as separate, there was substantial evidence to support the Board's finding that the two parcels had been consolidated. *DiCicco*, slip op. at 34. As *DiCicco* demonstrates, a deed describing parcels separately and the issuance of separate tax numbers to those parcels by OPA is not dispositive if the zoning record reflects that the parcels have been consolidated, as it does here.

Accordingly, we discern no error in the Board's holding that the zoning history reflects the three parcels making up the Property had been consolidated by the 2000 and/or 2001 Permits despite OPA's treatment of the parcels for tax purposes or the descriptions of the parcels in the Deed in Lieu of Foreclosure.

C. Whether the Board erred by accepting the terms "ground" and "ground level" to mean "street level."

At issue in this challenge to the Board's Decision is the interpretation of the words "ground" or "ground level," as used in the following Code sections, to mean "street level." Each term is relevant to Objector's arguments that the Proposed Development violates the Code by exceeding the permitted structure height and gross floor area. "Lot area" is defined as "[t]he total area of the horizontal plane of a lot at **ground level**," Phila. Code § 14-202(7) (emphasis added). The lot area is then used to calculate a property's gross floor area. The gross floor area is calculated by multiplying the lot area by the applicable gross floor ratio, which in the RM-4 district is 350% (3.5). Section 14-701(2) (Table 14-701-1) of the Code, Phila. Code § 14-701(2) (Table 14-701-1). Section 14-202(4)(b.6) specifically excludes "[u]nder**ground** accessory parking" from the measurement of a proposed development's gross floor area. Phila. Code § 14-202(4)(b.6) (emphasis added).

22

Finally, under Section 14-202(6) of the Code, a structure's height is measured using "the vertical distance from the **average ground level** at the base of the structure to the top of the structure." Phila. Code § 14-202(6) (emphasis added).

Objector argues that the Board erred by interpreting the terms "ground" and "ground level" as having the same meaning as "street level" for the purpose of calculating the Proposed Development's gross floor area, determining whether parking areas are included in the allowable gross floor area, and measuring height of a structure. Objector contends "ground level" is unambiguous and, under the rules of statutory construction, the undefined term "ground level" should be given its plain meaning as the level of the dirt or earth, which, in this case, refers to the bottom of the railroad cut. Using the plain meaning of "ground" or "ground level" would mean that the 125-foot height had to be measured from the base of the railroad cut and, because Developer owns only the air rights, Developer could not use the third parcel's lot area in calculating the allowable gross floor area. Noting that Developer relied on the defined term "average ground level" to determine its lot area, Objector asserts that this definition is not applicable to the definition of "lot area" because "[h]ad City Council intended 'ground level' as applied to [l]ot [a]rea to be computed on average ground level, it would have done so." (Objector's Br. at 23 (emphasis omitted).) Further, in acknowledging that the Code "defines a number of other terms that facially include" the words "ground" or "ground level," Objector argues this "goes to demonstrate that City Council knew how to define terms and that, if it had wanted [g]round or [g]round [l]evel to mean anything other than their ordinary meanings, it would have provided a technical definition." (*Id.* at 29.) Additionally, Objector argues the "Code's definition of 'street' further erodes any credible argument that [g]round [l]evel is the same as [s]treet [l]evel" because in all the

23

definitions of "street" in the Code "nowhere is 'street' [defined in] relat[ion] to [g]round or [g]round [l]evel." (*Id.* at 23.) To the extent that the term "ground level" may be ambiguous, Objector contends the Zoning Examiner's and the Board's interpretation are not entitled to deference because it is not a reasonable interpretation or demonstrated to be the Department's consistent position to interpret "ground level" as "street level." (Objector's Br. at 33.)

Developer responds that it properly calculated the lot area of the Property using street level as the Property's ground or ground level, rather than the bottom of the railroad cut. Developer contends that Objector's interpretations ignore the rules of statutory construction because "a word in a statu[t]e may have different meaning depending on the context in which it appears" and "must be construed with reference to the statute or ordinance in which [it is] used." (Developer's Br. at 28.) Developer acknowledges that the terms "ground" and "ground level" are not defined but maintains that those words are used in other defined terms, which, when read in context, support the Board's interpretation, and cites various Code definitions that it claims supports that interpretation. Developer also contends that Objector's interpretation violates other principles of statutory construction because that interpretation "would preclude building on air rights parcels at all" and would require "large portions of the livable space in a building to be built [] inside a railroad pit[,] which is clearly the kind of absurd result that courts stress must be avoided." (*Id.* at 31.) Further, Developer submits that Objector's

> interpretation necessarily means that any lot previously subject to alteration must be measured based on the alterations for any subsequent developers. Thus, if a developer completes an excavation and then abandons the project, a subsequent developer would be limited in the scope of its project based on that excavation, even where the previous developer's project fell within the applicable Code provisions. That cannot be the intent of the Code.

24

(*Id.*) Lastly, Developer submits that any ambiguity must be construed in favor of Developer, as the landowner, and the least restrictive use and enjoyment of the Property, which Objector's interpretation does not.

To resolve this issue, we must examine the Code's language to determine whether the Board's interpretation of the terms "ground" and "ground level" was contrary to the Code. The Department interpreted the term "ground level," for purposes of calculating the lot area and measuring the height of the Proposed Development, to be the same as the Property's street level. (FOF ¶ 32.) The Board agreed that this interpretation was consistent with the Code, thereby effectively adopting that interpretation as its own. (COL ¶¶ 12, 15.) As noted by both Objector and Developer, the words "ground" or "ground level" are used in other terms defined by the Code. Reviewing the Code sections at issue and the Code sections the parties cite as supporting their preferred interpretations,[14] we conclude the Board's interpretation is reasonable and consistent with the Code and, therefore, the Board's interpretation is entitled to deference. *Risker*, 886 A.2d at 731. We find particularly instructive the Code's definition of "**ground** floor," which is defined as "the story of the building at the **average ground level at the front of the building**" or where, "[i]n the case of buildings front on **two streets**," such as the Proposed Development, "the **ground floor** is the story at the **average of the ground level of the two <u>street</u>**

[14] In addition to citing to the definitions of "street" in Section 14-203(310) and "areas at ground level" found in Section 14-202(14)(a), Objector cites provisions of other codes, including the International Building Code, International Fire Code, International Plumbing Code, International Mechanical Code, and the International Electrical Code, in support of its preferred interpretation. However, we will only consider how "ground" and "ground level" are used elsewhere in **this** Code. Developer cites the definitions of "ground floor," "ground floor frontage," "basement," and "grade plane" found respectively in Sections 14-202(5)(a), (b), 14-202(5.1), 14-203(34), and 14-203(138.1) of the Code. Phila. Code §§ 14-202(5)(a), (b), 14-202(5.1), 14-203(34), 14-203(138.1).

**frontages.**" Phila. Code § 14-202(5)(a), (b) (emphasis added). Also persuasive is the definition of "ground floor frontage," which is "[t]he horizontal measurement of any portion of the **ground floor of a building fronting on a confirmed <u>street</u>**." Phila. Code § 14-202(5.1) (emphasis added). From these definitions, it appears the drafters of the Code did not preclude the ground floor from being defined in relation to the ground level of the street. It is unlikely that the drafters of the Code intended a structure's ground level to be at a different grade than its ground floor.

While Objector suggests we should interpret the term "ground level" according to what it characterizes as its plain and ordinary meaning, or by reference to other non-Code documents, we are not persuaded. It is true that pursuant to the rules of statutory construction, words and phrases are to be construed "according to their common and approved usage." 1 Pa.C.S. § 1903. However, we cannot read certain sections of the Code in isolation, but must read them together and in conjunction with the other sections of the Code. *MERSCORP, Inc.*, 207 A.3d at 865. Therefore, we will not simply look to the plain meaning of the term "ground" as being the dirt or earth at the bottom of a hole in the ground, rather than at the level of the ground around that hole, when other terms in the Code include the words "ground" and "ground level" and are defined in relation to the location of streets. When we consider the context, the Board's interpretation is reasonable and consistent with the Code's provisions and, therefore, is entitled to deference.

Further, Objector's interpretation is inconsistent with the principle that "[t]he Board [] has an obligation to construe the words of an ordinance as broadly as possible to give the landowner the benefit of the least restrictive use." *Riverfront Dev. Grp., LLC*, 109 A.3d at 366. Under Objector's interpretation, although an owner of an air rights parcel would be permitted to build on the air rights parcel, it

26

would be precluded from using that parcel to calculate the lot area for determining gross floor area because an air rights parcel will always begin above the dirt/earth. In certain circumstances, this interpretation would prevent construction entirely. For example, if Developer's interest in the Property consisted entirely of air rights over the railroad cut with an easement to construct pillars on the railroad bed, under Objector's interpretation, Developer would not be able to develop the Property because its lot area would be zero. "[T]he rules of statutory construction do not allow for the interpretation of . . . an ordinance which produces an absurd result." *Stoltzfus*, 937 A.2d at 550. City Council surely did not intend for all air rights parcels to be undevelopable.

Accordingly, in the absence of a specific definition in the Code or some clear indication that the term "ground level" could not be defined in relation to the street or street level, we cannot conclude the Board erred in interpreting the term "ground level," as used in the Code's definition of "lot area" and the method for measuring the height of structures, to mean street level.

We now address Objector's arguments regarding the Proposed Development specifically. Objector argues that the lot area of the Property should be measured at the bottom of the railroad cut, rather than at street level, and that by measuring the lot area at street level, Developer overestimated the allowable gross floor area. Further, Objector argues that the parking garage should have counted against the allowable gross floor area because it is not underground. Additionally, Objector argues that the Proposed Development, when measured from the bottom of the railroad cut, exceeds the height limit set forth in the Code.

Having determined that the Board did not err in its interpretation of the term "ground level," we agree with the Board that the allowable gross floor area was not

27

miscalculated, that the parking garage was properly classified as an underground parking garage and excluded from the gross floor area calculation, and that the Proposed Development, when measured from street level, does not exceed the height limit set forth in the Code.

## III.  CONCLUSION

For the foregoing reasons, the Board erred in determining Objector did not have standing to challenge the issuance of the Permit, but did not err in denying Objector's appeal from the issuance of the Permit for the reasons discussed above. Accordingly, we affirm common pleas' Order that upheld the Board's Decision.

 

 

 

_____
**RENÉE COHN JUBELIRER,** Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Battersea Ventures, L.P,       :
                 Appellant     :
                              :
          v.              :    No. 1440 C.D. 2019
                              :
Philadelphia Zoning Board of    :
Adjustment and The City of     :
Philadelphia, UCFP LLC       :

## O R D E R

**NOW**, November 18, 2020, the Order of the Court of Common Pleas of Philadelphia County issued in the above-captioned matter is hereby **AFFIRMED**. The Application in the Nature of a Motion to Dismiss for Mootness filed by UCFP LLC is hereby marked as **WITHDRAWN** pursuant to stipulation by the parties.

 

_____
**RENÉE COHN JUBELIRER,** Judge